Turney, J.,
delivered the following dissenting opinion :
On the 22d of February, 1860, Robertson Topp. and Isaac N. Davis entered into the contract evidenced by the following writings; to-wit:—
I have this day bargained and sold to Isaac N. Davis the following town lots in the city of Memphis, to-wit: Lot No. 3, fronting on Beal street 108 feet, by 145 deep; lots 9, 10, 11, and 12, fronting on Orleans street, up the aggregate 175 feet, by 163 feet deep on average; also lots 17, 18, 19, and 20, fronting in the aggregate 216 feet on Jefferson street, by 162 deep, all in block 57. I obligate myself to make said Davis a deed in fee for said lots. Lot No. 3, fronting on Beal street 108 by 145 feet, is taken at a valuation of $2,600, or I obligate myself to make said lot bring that price on the usual credit of one, two, and three years, with interest, if permitted to control the same.
Witness my hand and seal this 22d of February, 1860. Robs&tsoN Topp. [Seal.]
Witnesses;
F. M. White,
J. M. ToMehy.
This memorandum and contract this 22d of Febru *197 ary, 1860, by and between Isaac N. - Davis, of Mississippi, of the first part, and Robertson Topp, of the second part, witnesseth:
The . said Davis has this day, and by these presents, sold to Robertson Topp the tract of land upon which he is- now planting, in Bolivar county, Mississippi, on Bayou Phalia; to-wit,. all that part of Section 24 T. 22 R. 7 W. east of Bayou Phalia, containing 360 acres. Also, the west half of Section 19, T. 22, R. 6, W., containing 320 acres, both together containing 680 acres. Also, the following slaves (naming forty-eight). Also, all the mules, horses, and stock on the plantation, except a black horse belonging to Wm. D. Davis. Also, all the farming utensils and blacksmith’s tools. Also, all the carpenter’s tools; in fact, every thing on the place except the horse above mentioned, and except the household furniture in the room occupied by W. D. Davis, for the consideration of seventy thousand dollars, of which sum Robertson Topp has this day paid me thirty-five thousand, the receipt of which is acknowledged; he has likewise executed five notes of seven thousand dollars each, the first due 1st April, 1862, the other four each ensuing year thereafter, all of this date, and bearing interest at the rate of 8 per cent per annum. It is understood by the parties to this agreement, as there is not time to pass regularly deeds for the above mentioned property, that between this and the first of May, 1860, the parties are to meet in Memphis, when said Davis is to make, or cause to be made to said Topp a deed in fee for said land. Also a bill of *198 sale for said negroes, warranting soundness, and that they are slaves for life, except as herein stated, etc. . . . . The negro girl, Jennie, was burned on the leg, which injures her to some extent; if said. damage cannot be agreed upon between said Topp and said Davis, they mutually agree to leave it to their mutual friend, Frank White, to say what she is damaged by said burn. . ■ .
I. N. Davis, [Seal.]
KobbRtson Topp, [Seal.]
Witness:
F. M. White,
J. M. Tomeny.
Possession of the land and negroes, and other property described in the latter paper, was delivered to Topp on the 23d of February, 1860. The notes were changed from seven thousand dollars, the 8 per cent being added to the face, — the following is a specimen copy:
“ $8,736. February 23, 1860.
“On the 1st of April, 1863, I promise to pay to the order of Isaac N. Davis eighty-seven hundred and thirty-six dollars, at the Branch Bank of Tennessee at Memphis. Value received. Robertson Topp.”
The first of these notes was paid at its maturity, on the 1st of April, 1862; and four thousand dollars were paid on the 24th of May, 1862, on the one falling due in April, 1863.
*199 On the 13th of March, 1866, and the 6th of September following, the bills, original and amended, in this cause, were filed by Robertson Topp, both sworn to by his son and agent, Edward L. Topp, seeking to avoid that part of the contract set out in the first writing, because no sufficient description is given of the property, and no consideration recited, insisting it is void under the statute of frauds, and seeking to rescind the entire contract for the fraud of Davis in falsely representing title in himself to the land and negroes, when he had no title to a portion of the land, and several of the negroes belonged to his children in right of their mother, and because the consideration was usurious. It is also insisted the entire contract is executory, and not executed.
I answer the first objection, That we judicially know the city of Memphis to be in Shelby county, Tennessee. The descriptions of the lots by number, and certain feet front on particular streets, with depth of about a certain number of feet, is as • definite and particular as it reasonably can be, so that with a plan of the city there can be no trouble to find, by the exercise of ordinary industry and care, the exact parcels or lots. In fact, it is difficult to see how, in a city, a more certain description could be given.
The consideration need not be stated. The statute of frauds and perjuries in requiring a memorandum in writing for the sale or lease of land for a longer term than one year, has reference alone to the land, and is founded in one rule of property, that title to real estate cannot vest in parol. The statute, as its *200 title imports, is intended to protect purchasers and owners against the frauds of each other, and of third persons, by specifying in writing the lands leased or sold, with reasonable certainty. The reason ot the statute does not apply to the consideration, which is merely a debt, the right to which may rest in parol, or which may be discharged without evidence in writing, parol proof being competent and sufficient to establish or acquit. The consideration for the lots in this case is shown to be fifteen thousand dollars in the land and slave purchase: this appears from the bills.
Isaac N. Davis died in June, 1860. The bills are answered by his. executor, F. M. White, and his widow and heirs, who deny- the fraud and false representations, and insist that the contract was executed, and that Topp got a good title.
Under the issue thus made, did Davis falsely represent his title?
The proof upon this subject is exclusively inferential, and must be determined by a comparison of circumstances.
We commence the investigation with a knowledge of the death of Davis a very few months after the making of the contract; therefore we cannot have the benefit of his statements in response to bills appealing to his conscience for their truth.
In the next place, we have the complainant, about two years after the death of Davis, paying off one note in full, and four thousand dollars on the second more than ten months before its maturity, without *201 either asking or making question of fraud or want, of title.
Then he rests until the 13th of March, 1866, when he files his bill, and in September his amended bill, in neither of which he gives the court nor his adversaries the benefit of a statement on oath of the facts constituting the grounds of his claim to relief, but contents himself with the affidavit of his son, who does not pretend to know, and who, so far as the record discloses, was wholly ignorant of the facts. Any other person, having confidence in the truthfulness of complainant, could as well have made and subscribed the oaths to the bills.
While it may be perhaps authorized, it is a practice of very doubtful propriety, no reason being given for the absence or failure of the principal, to award writs of injunction upon the oaths of agents utterly ignorant of the facts. Certainly, a bill so supported cannot be regarded as making a prima facie case, or as' being even persuasive in the trial of a case upon its merits. On the contrary, these circumstances are against the complainant.
To strengthen this view, we recur to the paper second in order. There we find the recital: “That between this and the first of May, 1860, the parties are to meet in Memphis, when said Davis is to make, or cause to be made, to said Topp a deed in fee for said land. Also, a bill of sale for said negroes, warranting soundness, and that they are slaves for life.”
Now, if the complainant was so implicitly and con--fidently relying upon the representations of Davis as *202 to the genuineness of his unincumbered title, it is at. least remarkable that when he comes to reduce to-writing the terms of his contract and future covenant, the main obligation moving him to the trade should be omitted. Certainly so important a provision could not have been overlooked in a transaction of such magnitude. The wording of the instrument applied to the land; and interpreted by the rule that an estate in fee may be created without warranty, express or implied, carries strong conviction that the title to the lands had been discussed and understood between the contracting parties; and the more especially are we thus impressed, by the fact that White, a joint owner with Davis of a part of the land, was a witness to the instrument, thereby estopping from denying the right of Davis to convey. Certainly, Davis did not dare to represent the title as altogether in himself, in the presence and hearing of a joint owner, and have that joint owner to witness in writing his solemn contract of sale.
That Davis represented as to this land the truth, is a conclusion not to be escaped from through the facts and circumstances presented in the record. Considering the language of the warranty to be made in future as to the negroes, by a similar precess of reasoning we conclude that Davis gave the history of the title of the negroes; hence the leaving out of an undertaking to warrant title, and the only evidence in the record of the title of Davis’s children to any of the slaves.
The will of Davis, made so soon after the trade. *203 directing his executors to buy a negro in place of Eanny for his children, and disinheriting such of them as should contend for and recover any of the other negroes coming from the estate of the mother, tends strongly to show that such was the plan suggested by Davis, after stating the condition of the title, and agreed to by Topp; or suggested by Topp and agreed to by Davis, as the proper one to make safe the title of Topp under his purchase. This view is fortified by the evasive and inconsistent but connected statement in the amended bill; “these defects of. title have very recently come to his knowledge. That your orator, believing that said Isaac if. Davis could and would execute said contract of February 22, 1860, and that he had a valid title to said land, slaves, and other personal property, immediately, took possession of said land, slaves, and other personal estate, and pitched a crop on said plantation, and proceeded to make and erect upon said land lasting and valuable improvements, and to make other large and valuable outlays, upon the faith of his getting a title. That your orator, under these circumstances, could not abandon the said land, slaves, etc., so long as there was the least hope that the contract of the 22d of February, 1860, would be executed. To have done so would have involved your orator in very great loss; indeed, would have almost ruined him. That it was in this faith and under the pressure of these circumstances that your orator made ' the payments subsequent to the date of said contract.”
It is quite apparent that while complainant attempts *204 to make out his case, and explain his delay in complaining, he admits a knowledge of facts making, as he charges, a defect of title to the land and negroes, and that he had such knowledge prior to the first of April, 1862. The question arises, Where did he acquire such knowledge? We answer, not from the executor, or widow, or heirs of Davis, as we know, because he has brought them before the court without such allegations in either of his bills. With such knowledge, he pays more than twelve thousand dollars in furtherance of the contract, and at the times of the payments does not think enough of the objection to title to mention it even to the executor. He fails to inform us how, or from whom, he learned these things, and the record furnishes but one source, which is the communication of Davis at the time of the negotiations and trade on the 22d of February, 1860, or before, as it is reasonable to presume consummation was not had in a day. . We add, as an important item of evidence, tending to show the absence of false representations by Davis as to the title to the land, the allegation of the original and amended bills, “That the chief and prime inducement on the part of your orator to make the contract was the acquisition of the negro property embraced in the contract. That lands in the Mississippi bottom were abundant and readily had, but it was often difficult to find parties who would dispose of their slaves, and when plantations were offered for sale with the slaves upon them, the slaves almost universally constituted the chief inducement with the purchaser to buy the property. That *205 such was the case with your orator • in making the contract,” etc.
To sum up, then; the result upon this branch of the case is, Topp was particularly anxious to procure the slaves, and in view of the ability of Davis to hold disinheritance in térrorem over the children who might claim through the mother, was willing to take them with no warranty from Davis except soundness and slavery for life. The land was a mere incident, and not an inducement, and was taken with its imperfections of title, real or imaginary, to make certain the acquisition of the slaves.
The contract was an executed one. Nothing is left out that is necessary to pass the property, — the right of property, the possession, and the right of possession. Under it Topp could have maintained against Davis, or another, ejectment, trespass, trover, or other action for injury done to or upon the property. The leaving undone the making of a formal deed or bill of sale, does not affect the title. As against Davis, and those claiming under him, it was perfect; and for this end no writing was necessary as to the slaves. The failure to meet and pass deeds and execute bills of sale on or before the first day of May, does not in any way affect the rights of the parties. The only purpose of this provision was, to give to either party the right to have mere formal title papers, and in no way impressed the main intention of the parties, to pass property and its title. It provides for far more than substance.
But even if time had originally been material, *206 Topp is in no condition to complain, as he waived it before the death of Davis — by his absence from Memphis while Davis was there on time — and after the death of Davis, by two payments to his executor without complaint.
Trying the question by complainant’s own rule, he is responsible for the loss of the slaves. He should have demanded of the executor and heirs a consummation or recission. If he was ever entitled to relief, he has forfeited it by his non-action. Under his claimed state of facts, the negroes perished as property upon his hands. The death of Davis should have energized him to certainty. Whatever 'may have been originally the obligations of Davis, his death placed Topp in the position of an actor, and the executor .and heirs were entitled to notice of his purpose. If Topp did not know the facts constituting what he insists to be fraud, he afterward found them out, and still did two acts in affirmance, each of which was a ratification with notice, and precludes him from relief by rescission, leaving him to his remedy for compensation in damages. A title perfected by deed in the vfendor after his sale to another, that deed being the consummation of such obligation to make title as would be enforced in a court of equity, is not an after acquired title which the subsequent vendor may refuse or rely upon for rescission.
A provision in a will, “ That my executors may and do sell my wild lands at public or private sale for cash or on credit, and upon such terms as to them may appear most advantageous, when the follow *207 ing prices can be obtained (fixing the prices), and if they sell on credit, that they make no title until the purchase money is paid,” is not such personal trust requiring, the exercise of discretion as requires the cooperation of two or more executors. The discretion has been defined and exercised by the testator in the will, leaving nothing to the executors but the execution of a positive direction, which is complete by the act of one as if by all. The citizen of another State is not presumed to know the local or statute laws of this State. The facts show that Davis, a citizen of Mississippi, was ignorant of our usury laws at the time of the execution of the five notes on the 22d of February, and that learning it, he on the next day had the notes changed, including the eight per cent; but this was simply carrying out the contract upon the basis of the value of the property agreed upon, and was never intended as unlawful interest or usury,, but as part of the consideration. As if a vendor say to a vendee, I will take $100 cash for my property, or $125 at the end of twelve months. Now, if the vendee accept the latter proposition, no one will contend, when the debt becomes due, that the twenty-five dollars was usury. If, however, the parties, by mistake or ignorance, provide in a note that one hundred dollars, with the rate of twenty-five per cent interest shall be paid, no doubt exists of the usury. If, after such note had been executed, the payee discovers that the law has been violated, what objection can there be to him going to the maker and saying to him, I have mistaken the law, and your note is so *208 worded as to make it void for usury. We estimate the property at $100 in cash, and $125 on time. I will deliver up the note and take another for the amount of the contract.
The eight per cent was not on the value of the money, but was a substantial part of the credit value of the property, and made so to appear upon the earliest opportunity of the vendor and payee.
It is unnecessary to consider the various other questions urged in argument, as those we have determined are decisive of the case.
The case will be remanded to the chancery court, that an account be had of the damage to the negro, Jennie, at the time of sale on account of burns, which will be credited on the amount due from Topp.
The Chancellor will make the necessary orders for the enforcement of the attachments at law and the injunction beside.
■ The decree, modified to conform with this opinion, is affirmed. Complainant will pay costs.
This was delivered as the opinion of the court at the last term. Upon rehearing, it has been modified. I still think this the law of the case, and adhere to it, and file it as a dissenting opinion, for publication.
Turney, J.